Jessie James Finch and Anna May Finch, and Jessie James Finch v. Commissioner.
Finch v. Commissioner
Docket Nos. 51567, 51568.
United States Tax Court
T.C. Memo 1955-179; 1955 Tax Ct. Memo LEXIS 151; 14 T.C.M. (CCH) 692; T.C.M. (RIA) 55179; June 30, 1955
*151 Petitioner was employed as manager of a cottonseed oil mill in 1945 of which R. R. Tipton was a stockholder and director. Tipton wanted to build a mill for dehydrating and processing alfalfa hay into meal. He induced petitioner to leave his employment in September 1945 and to draw plans for and to supervise the construction and operation of the alfalfa mill. Petitioner and Tipton agreed, orally, that petitioner was to receive $300 a month plus 50 per cent of the profits of the alfalfa mill. Tipton advanced the money to construct and equip the mill. The management of the business and the income therefrom were under the complete control of Tipton. In 1946 Tipton had his attorney draft a purported partnership agreement and other legal papers which petitioner signed as a partner at the request of Tipton. Petitioner never received a share of the profits of the business. He was paid a salary, only. In December 1948, Tipton represented to petitioner that the business was "broke," and he offered to pay petitioner $12,500 for whatever interest petitioner had in the business or profits if he would "get out." Petitioner accepted the offer and terminated his association with the business on *152 December 7, 1948. Held, Tipton, acting in good faith and with a business purpose, did not intend to form a partnership with petitioner. The business of the alfalfa mill was not conducted by Tipton and petitioner as partners during the period from October 1945 through December 7, 1948. Held, further, that petitioner was an employee of Tipton on a salary and profit sharing basis; and that the payment which petitioner received upon termination of his employment constituted additional compensation for his services. Lewis R. Donelson, 3rd., Esq., Commerce Title Building, Memphis, Tenn., and Edward G. Grogan, Esq., for the petitioners. Frederick T. Carney, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax for the years 1947 and 1948, as follows: Docket
No.
Petitioner
Year
Deficiency
51568
J. J. Finch
1947
$1,212.35
51567
J. J. and A. M. Finch
1948
3,657.64
The deficiencies result from the respondent's determination that petitioner, Jessie James Finch, was a partner in and is taxable on a distributive share of the net income of a business *153 which was conducted under the name of Reelfoot Alfalfa Mill. The chief question to be decided is whether petitioner was a partner in or an employee of the business. Petitioners claim that there is an overpayment of income tax for 1947, and that there is no deficiency for 1948. Findings of Fact The petitioners, husband and wife, are residents of Tiptonville, Tennessee. They filed a joint return for 1948. Jessie James Finch filed an individual return for 1947. The returns were filed with the collector for the district of Tennessee. Since the questions to be decided relate to Jessie James Finch, only, he is referred to hereinafter as the petitioner. Petitioner had been employed by the Lake County Cotton Oil Mill for 19 years prior to October 1945, as mill manager, on a salary and bonus basis. He was 65 years old in 1945 and had been employed by cottonseed oil and alfalfa mills for 40 years prior thereto. He had extensive experience in the layout, construction and operation of such mills. Petitioner terminated his employment with the Lake County mill in September 1945. From October 1945 until December 7, 1948, petitioner was associated with R. R. Tipton in the construction and *154 operation of an alfalfa dehydrating plant known as Reelfoot Alfalfa Mill, referred to hereinafter as either Reelfoot or the alfalfa mill. On December 7, 1948, petitioner's association with Reelfoot was terminated by mutual agreement, and, on the same date, petitioner received $12,500 from Tipton. Tipton continued to operate Reelfoot after December 7, 1948, and eventually his children and their spouses took over the business. The business of Reelfoot was started under the following circumstances: Tipton was a stockholder and director of the Lake County Mill where petitioner was employed. In early 1945, Tipton told the petitioner that he wanted to construct a mill for dehydrating and processing alfalfa into meal. Petitioner knew how a plan for the construction of a mill should be laid out and how such a mill should be constructed, equipped and operated. Petitioner agreed to draw up the plans for the mill, to supervise construction of the mill, and to supervise the operation of the mill. It was agreed, orally, between Tipton and petitioner that each was to receive a salary of $300 a month from the business, and that the profit, if any, after the payment of salaries were to be divided *155 equally. In reliance upon the oral agreement with Tipton, petitioner left his employment with the Lake County Mill in September 1945 and began work on plans for the construction of the alfalfa mill. Construction of the mill was started in October 1945 and was completed in May 1946. The mill began operations in May 1946, and from that date until December 7, 1948, the operation of the mill was supervised by petitioner. Petitioner reported his income on a cashcalendar year basis. During the entire period petitioner was associated with Reelfoot, he received a salary of $300 a month. Petitioner never received any share of the profits of Reelfoot prior to December 7, 1948. The total amounts received by petitioner from Reelfoot in 1945, 1946, 1947, and 1948 were as follows: Year
Amount
1945
$ 3,600
1946
3,600
1947
3,600
1948
3,600
1948
12,500
Tipton owned the land upon which the Reelfoot mill was constructed. Neither Tipton nor the petitioner made any initial contribution of capital to Reelfoot. Tipton advanced $37,620.51 to construct and equip the alfalfa mill. This amount was entered on the books by Reelfoot as a loan. The amount of the loan by Tipton *156 was not reduced by payments at any time during the period from October 1945 through December 7, 1948. In June 1946, Tipton had his attorney prepare an agreement entitled "Articles of Partnership of Reelfoot Alfalfa Mill" between Tipton and Finch. The agreement was signed by Tipton and petitioner on June 11, 1946. The purported partnership agreement is incorporated herein by this reference. Petitioner was not consulted in the preparation of the purported partnership agreement. Petitioner signed the agreement, at the insistence of Tipton, without any clear understanding of its provisions or import. The purported partnership agreement provided, among other things, that all profits of the "partnership", except the salaries to be paid the "partners", were to be paid to Tipton to be applied to the indebtedness to him for the sums advanced until such time as the advances were repaid in full with interest. "Capital accounts" were set up on the books of the alleged partnership from Tipton and Finch. As of December 7, 1948, petitioner's alleged capital account showed a credit balance of $31,999.49. The books of Reelfoot were kept on the basis of a fiscal year ending on March 31st. *157 The business of Reelfoot consisted of dehydrating and processing alfalfa hay into meal which it sold, principally, for feed. Reelfoot purchased hay in the fields from farmers; it cut the hay, hauled it to the mill, processed the hay into meal and sold the meal in 100 pound bags. The operating season of the alfalfa mill was from about May until November. At all times material, the business was under the control and domination of Tipton. Finch did not participate in the management of the business. Finch's duties consisted solely of supervising the milling operations and maintaining the mill and equipment in operating condition. Tipton employed Ivan Sullivan, his son-in-law, as office manager and bookkeeper. Tipton or Sullivan handled all business matters. Reelfoot did not have any income in its first fiscal year ended March 31, 1946. The alfalfa mill was not put in operation until May 1946. Construction of the mill was started in October 1945 and was completed in May 1946. Tipton filed a partnership return of income in the name of Reelfoot Alfalfa Mill for the fiscal year which ended March 31, 1947. Tipton and Finch were listed in the return as partners. The return reported that *158 the net income of Reelfoot for the fiscal year was $31,810.09. Tipton's distributive share of the net income of the alleged partnership was reported as $16,972.32, and Finch's share, as $14,837.77. A partnership return of income for Reelfoot Alfalfa Mill was not filed for the fiscal year which ended March 31, 1948. As disclosed by the books, the net income of the business for the fiscal year which ended March 31, 1948, was $12,003.03. The salaries paid to Tipton and Finch, $3,600, each, in the fiscal year were deducted on the books as an expense in arriving at net income. Tipton filed a partnership return of income in the name of Reelfoot Alfalfa Mill for the period April 1 through December 7, 1948. The return contained the notation "Final Return, Partnership Dissolved." The return disclosed net income for the period in the amount of $39,417.39. Tipton's distributive share of the net income of the alleged partnership was reported as $20,372.07, and Finch's share as $19,045.32. Finch never received 50 per cent of the profits of the business as was provided in his oral agreement with Tipton. The only sums which Finch received from Reelfoot between October 1945 and December 7, 1948, were *159 his salary payments of $300 a month. In the early part of December 1948, Tipton told Finch that the business "was broke." Tipton then offered to pay petitioner $12,500 for whatever interest he had in the business if Finch "got out." Finch accepted the offer. Finch terminated his association with the business on December 7, 1948, on which date he received $12,500 from Tipton. Petitioner's income tax return for 1947 was prepared by Sullivan. In the return, there was included in gross income, as reported, the amount of $11,837.77, as petitioner's distributive share of the net income of the alleged partnership. There was not included in gross income, as reported, any amount for salary received by petitioner from Reelfoot in 1947. Petitioner paid the tax shown as due on the return in the amount of $3,014.04 on or before March 15, 1949. In order to secure the funds to pay the tax, petitioner sold United States Government bonds which he owned. Petitioner, in his income tax return for 1948, included in gross income as reported the sum of $16,100 as compensation received from Reelfoot in 1948. The sum of $16,100 was composed of two items; Finch's salary of $3,600, and the payment of $12,500 *160 which he received from Tipton upon the severance of his association with Reelfoot. On April 27, 1949, petitioner filed a claim for refund for 1947 in which he asserted that he had overpaid income for 1947, and that the overpayment was due to the erroneous inclusion in his taxable income of $8,237.77 which he had reported in his return as his distributive share of income of a partnership, Reelfoot. The substance of petitioner's claim for refund was that he actually received only $3,600 from Reelfoot in 1947 and was not taxable upon income from Reelfoot in excess of $3,600. Also, petitioner, on May 16, 1949, filed an amended return for 1947 in which the only income which he reported from Reelfoot was salary in the amount of $3,600. Petitioner's original and amended returns for 1947 were audited. The Commissioner's agent concluded that petitioner was not taxable on $8,237.77, for income from Reelfoot, and he recommended that the claim for refund of tax for 1947 should be allowed. Tipton learned about the agent's report and he filed a protest against the agent's recommendation. The Commissioner reversed the agent's recommendation, and, accordingly, there were issued the statutory *161 deficiency notices for 1947 and 1948 which gave rise to these proceedings. In the deficiency notice for 1947, the respondent increased petitioner's distributive share of net income of Reelfoot for the fiscal year ended March 31, 1947, from $11,837.11, as reported, to $14,837.77. In the deficiency notice for 1948, the respondent included in petitioner's taxable in come amounts which the respondent determined constituted petitioner's distributive shares of partnership income for the two taxable periods of the partnership which ended in 1948, namely, the fiscal periods which ended on March 31, 1948, and December 7, 1948. The respondent included as petitioner's distributive share of partnership income for each of these fiscal periods the amounts of $9,601.51, and $19,045.32, respectively. In his return for 1948 the petitioner did not report in his taxable income any amounts as his distributive shares of the alleged Reelfoot partnership's earning for the two fiscal periods of the alleged partnership which ended in 1948. The petitioner and Tipton did not in good faith and acting with a business purpose intend to join together in the present conduct of the business of Reelfoot as a *162 partnership at any time during the period which began in October 1945 and ended on December 7, 1948. During the above stated period, the petitioner was an employee of a business known as Reelfoot which was carried on by Tipton as a sole proprietorship. Petitioner was employed by Tipton on a salary and profit sharing basis. The sum of $12,500 which petitioner received on December 7, 1948 constituted additional compensation for Finch's services during the entire period he was employed by Tipton. The amount was arrived at by Tipton and Finch through negotiation. Opinion The question to be decided is whether during the period from October 1945 until December 7, 1948, petitioner and Tipton operated the business of Reelfoot Alfalfa Mill as a partnership. Petitioner contends that he was not a partner in Reelfoot, that his association with the business was that of an employee on a salary and profit sharing basis, and that he is taxable only on the amounts of compensation which he actually received. Respondent contends that petitioner was a partner in the conduct of a business. He relies mainly upon a written agreement purporting to be a partnership agreement, and upon entries in the *163 books of Reelfoot which indicate that petitioner had a partnership interest. The general test to be applied in determining the validity of an alleged partnership is set forth in . The real intent of the parties is to be determined from a consideration of all of the relevant facts and circumstances. It is clear that the business of Reelfoot was not conducted by petitioner and Tipton as partners. Tipton, who promoted and financed the construction of the mill, never really intended to form a partnership with the petitioner. The arrangements made by Tipton were one sided and for his exclusive benefit. The conduct and management of the business was under the complete control and domination of Tipton at all times. The income of the business and the purposes for which it was used were likewise controlled by him. The absence of a joint right to control and dispose of partnership properties negates the existence of a partnership. See, . The chief asset of Reelfoot was the mill. Tipton *164 owned the realty, and he advanced the funds to construct and equip the mill. Petitioner did not contribute any money in connection with the construction or equipment of the mill, and he never agreed to make any contribution to the capital of the business. It is true that on August 5, 1946 petitioner and Tipton as "partners" signed a promissory note for the advances made by Tipton which was secured by a deed of of trust on all of the property of the alleged partnership. However, the note and the deed of trust were prepared by Tipton's attorney, and they were signed by petitioner at the request of Tipton. The fact that the note and deed of trust were executed by petitioner as a "partner" is not determinative of the question to be decided in the light of the entire record. One of Tipton's purposes, undoubtedly, was to protect his investment against the claims of creditors. Also, he intended that his advances of money for the construction of the mill should be repaid first out of earnings. The purported partnership agreement provided that, at the discretion of Tipton, the profits of the business, if any, after the payment of salaries were to be applied to reduce the indebtedness to Tipton *165 until the sums advanced by him were repaid in full with interest. The indebtedness to Tipton was not paid during the period in which petitioner was associated with the business. Although the business had earnings in each of the fiscal years ended March 31, 1947 and 1948, the earnings were neither applied to reduce the indebtedness to Tipton nor distributed. The record does not show why the earnings were not applied to the indebtedness to Tipton. It is clear, however, that as long as the loans were unpaid, petitioner could not demand a share of the profits, since, under the agreement, petitioner had no right to a share of the profits until Tipton's advances were repaid. The petitioner argues that his agreement with Tipton was no more than an agreement to share profits, and he contends that an agreement to share profits does not necessarily constitute a partnership agreement. He cites in support of this proposition, Norment v. Hull, 1 Humph. 320 (Tenn. 1828); Bell v. Hare, 12 Heiskell 615 (Tenn. 1874); and . In Bell v. Hare, supra, the court held that even though the parties held themselves *166 out to be partners, the basic nature of their relationship was that of a profit sharing employment, saying: "The only indication in the agreement that it was intended to constitute a partnership is furnished by the provision for a division of the profit * * * "Participation in profits, either gross or net, is usually one of the tests as to the existence of a partnership; but it is not conclusive. If it appear by proof, or by the terms of the articles of agreement, that a share in the profits is given to one of the parties as a mode of compensation for services, the presumption as to a partnership is thereby rebutted." The record shows that petitioner did not agree to share in the losses of the mill, if any. No mention was made of losses when petitioner and Tipton entered into the oral agreement in 1945. The purported partnership agreement, which was executed in June 1946, is silent on the matter of petitioner's obligation to share in the losses, if any. In this connection, the agreement provides only that "each partner shall be jointly liable for the debts and obligations of said partnership. *167 " The situation here resembles that in , where the court said: "* * * but such an agreement does not in itself create between the parties the relation of partnership. The participation was not in profits as such. The arrangement was simply a mode of ascertaining what compensation should be paid to an employee. The complainant made no proof that he was to share in the losses. When I asked him the question whether he was by the agreement to share in the losses of the business, it seemed to him an entirely novel proposition, which he had never before considered His understanding evidently was that Redrow was carrying on the business at his own risk, and was to compensate him for his services by a weekly payment and a share of the profits, if any were made." During the entire period of the petitioner's association with the mill, he did not in fact share in the profits, and under the provision of the purported partnership agreement that Tipton's advances were to be repaid out of profits, first, petitioner never became entitled to receive any more than $300 per month. It has been held that postponement of the right to receive profits *168 negates the existence of a partnership. See , and . In the Miller case, supra, the parties had orally agreed to share profits from the operation of a cotton gin; providing that one of the parties would purchase an interest in the business out of his share of the profits. Papers were drawn indicating such an agreement. Operations were commenced under the agreement but the party who was to purchase an interest out of profits died before the papers were executed. The court held that until such time as the employee had actually acquired an interest in the business he was considered to be merely an employee on a profit sharing basis. The Underberg case held even more clearly that where a person was using his share of the profits above a fixed salary to purchase an interest in the business, it did not become a partnership until the required payments from profits had been completed. Accordingly, it would appear that the arrangement between petitioner and Tipton was at best an executory agreement which might have, upon ultimate payment of all the indebtedness outstanding, *169 matured into something more permanent. The respondent is contending, in effect, that petitioner constructively received a share of the profits of Reelfoot, as in a normal partnership relation where profits are, voluntarily, permitted to accumulate. Petitioner did not constructively receive, in the taxable years, a share of profits of the alleged partnership. No such basis for a theory of constructive receipt here exists. Petitioner could not demand a distribution of his share of profits, and the date when he could do so was under the exclusive control of Tipton because of his rights under the repayment provision of the deed of trust and purported partnership agreement. This Court has long ago recognized this principle. . It has been held that an arrangement permitting one of the parties to purchase an interest in the business out of his share of the profits does not constitute a partnership agreement until the purchase has been completed. Cudahy Packing Co. v. Hibou, 46 S. 72 (Miss. 1908); ; *170 , U.S.D.C., May 25, 1955. In the first two of the above cited cases, one of the parties advanced all of the money for the purchase of the firm property. The other was to obtain an interest by applying his share of the profits against the purchase of the assets. The agreements were terminated before such payments were completed, and the profit sharing party sought to claim a partnership. The courts held that such an arrangement did not constitute a partnership. The similarity of these facts to the present case is obvious. The mill assets were actually encumbered by a mortgage to Tipton which was never paid off during the period of petitioner's association with the mill. Any right that he had in the assets was inchoate, and does not satisfy the requirement of true joint ownership and control of the partnership assets. No payments were made to petitioner before termination. Petitioner really never possessed any control over the income or the assets of the business. In addition to negativing the partnership existence, this factor shows that any rights of petitioner, to both profits and property, failed to mature under the agreement as carried *171 out. During the entire time that petitioner was associated with the business, his duties consisted solely of planning and supervising construction of the mill, supervising the milling operation, and maintaining the mill and equipment in operating condition. Tipton never consulted with petitioner on business matters, and petitioner never participated in the management of the business. Further indication of the lack of a real intent on the part of Tipton to form a partnership with petitioner is found in the manner in which the petitioner's association with the business was ended. After petitioner had served Tipton's purposes, Tipton induced the petitioner to "get out" by representing to him that the business "was broke." Tipton offered to pay petitioner $12,500 for whatever interest petitioner had in the business or profits. Petitioner accepted the offer and terminated his association with the business. There was no accounting as between partners. Petitioner was paid only $12,500 although his alleged capital account on the books of the alleged partnership showed a balance to his credit on December 7, 1948 in the amount of $31,999.49. Under similar facts, this Court has held that *172 where there is no proof of a real intent to become partners in the operation of a business, profit sharing arrangements do not constitute partnerships for tax purposes. See, , affd. ; , affd. sub nom., ; . Upon all of the evidence, it has been found that the relationship of Tipton and petitioner in the conduct of the business of Reelfoot was that of an employer and employee. Tipton wanted to build an alfalfa mill. Petitioner had the "know how." Tipton was interested in securing petitioner's services, and he induced petitioner to leave his employment with the Lake County Mill. Petitioner and Tipton entered into an oral agreement, the extent of which was as follows: Petitioner agreed to draw the plans for the mill, and to supervise its construction and operation. Tipton agreed to pay petitioner a salary of $300 a month plus 50 per cent of the profits of the business, if any, for his services. There was no mention made of the provision, which Tipton later had incorporated in the purported partnership *173 agreement, that, at the discretion of Tipton, the earnings of the business, after the payment of salaries, were to be applied against the advances made by Tipton until the full amount of the advances plus interest were repaid. Also, there was no oral agreement that petitioner was to purchase an interest in the business with his promised share of the profits, and petitioner never in fact acquired a capital interest in the business. We conclude from the evidence that Tipton and the petitioner never intended to, and did not in fact, conduct the business of Reelfoot as a partnership. The purported partnership agreement was prepared by Tipton's attorney. Petitioner was not consulted in its preparation. It is apparent from petitioner's testimony that he signed the agreement, at the insistence of Tipton, without any clear understanding of its provisions or import. Furthermore, it is clear from the evidence that the purported partnership agreement was honored by Tipton more in the breach than in the observance. Also, under all of the circumstances, we are not impressed with the fact that the books of Reelfoot indicated that petitioner was a partner; that partnership returns of income were *174 filed; or that petitioner signed various legal papers as a partner. Respondent in effect seeks to tax the petitioner upon income which petitioner neither received nor had the unqualified right to demand. This he may not do. Petitioner was no more than an employee of Tipton. Respondent's determination is reversed. Because of the conclusion reached under the chief issue, it is unnecessary to consider a further question relating to valuation of the inventory of the mill. Decision in Docket No. 51567 will be entered for petitioners. Decision in Docket No. 51568 will be entered under Rule 50.